## Tenaglia v. Procter & Gamble Inc.

C.P. of Delaware County, no. 95-10260.

*Ronald David Ashby,* for plaintiff.
*Francis McGill Hadden,* for defendant.

SURRICK, *J.,* December 28, 1998—On August 21, 1995, plaintiff, Valerie R. Tenaglia, filed a complaint

against defendant, Procter and Gamble Inc., alleging personal injuries sustained as a result of a defectively manufactured product. The defective product was a cardboard box containing Pampers diapers manufactured by defendant. Plaintiff alleged that she sustained serious and permanent injury to her arm when she attempted to open the cardboard box. The defect alleged was excessive glue. Plaintiff's complaint sounded in negligence, strict liability and breach of implied warranty.

After the pleadings had been closed and after plaintiff and a representative of Procter and Gamble had been deposed, defendant filed a motion for summary judgment. The motion was based upon plaintiff's spoliation of evidence.[1] After review of briefs submitted by counsel and oral argument an order was entered granting defendant's motion and judgment was entered in favor of defendant and against plaintiff. Plaintiff filed an appeal from that order thus necessitating this opinion.

## FACTS

The undisputed facts in this matter are as follows. Plaintiff has been an employee of Rite Aid Corporation since 1979. On August 25, 1993, plaintiff was a pharmacist at the Rite Aid pharmacy located in Media, Delaware County. Part of plaintiff's job at Rite Aid included opening boxes of merchandise and stocking shelves. Rite Aid sold Pampers diapers manufactured by de-

---

1. Defendant also filed a motion for summary judgment contending that plaintiff had failed to answer expert interrogatories and therefore had no evidence to establish medical causation. Plaintiff responded to this motion requesting additional time to answer the expert interrogatories. Plaintiff indicated that she wanted the court to rule on the spoliation issue before she incurred the expense of obtaining reports from expert witnesses.

fendant, Procter and Gamble. August 25 was a delivery day at Rite Aid. This is a day when boxes of merchandise are delivered to the store by truck. The trucks are unloaded and the boxes of merchandise are taken into the store. Once in the store the boxes are put on the floor in the aisles. When the Rite Aid employees get a chance the boxes are opened and the shelves are stocked.

Sometime on the morning of August 25, a customer who was carrying a baby approached plaintiff and asked plaintiff if she would open one of the large boxes which contained packages of Pampers. As plaintiff was attempting to pull open the flaps on the top of this cardboard box she felt her arm "pop" and she felt pain. Realizing that she had sustained an injury to her arm plaintiff asked a co-employee to finish waiting on the customer and plaintiff went back to the pharmacy and put ice on her arm.

The cardboard box, which plaintiff was attempting to open when she was injured, remained in the aisle of the store for the rest of the day. Later in the day, plaintiff went back to the box to see what was wrong with it and why it was so difficult to open. She determined that the box was defective because there was excessive glue on the box. She characterized the glue as being "globs of glue on it . . . glue all over the thing . . . it had ooze on all sides. It came out of the upper top between the two flaps and it came out on the side, running over the side." [2] In addition to

---

2. Interestingly, on November 10, 1995, almost three months after the accident, plaintiff filled out an accident form for her employer concerning this incident. The form contained a question as to whether the box that caused the injury was defective. To this question plaintiff answered "No." In addition, in a narrative on how the accident happened plaintiff wrote:

the co-employee who had finished waiting on the customer, plaintiff also told her store manager about the incident. However, plaintiff did not tell anyone to save or preserve the box. Nor did plaintiff consider saving the cardboard box herself. She knew that the cardboard box would ultimately be sent to the crusher in the basement and would be disposed of in the trash. This in fact happened.

## DISCUSSION

Almost 100 years ago, the doctrine of spoliation was discussed by our Supreme Court when, in the case of *McHugh v. McHugh,* 186 Pa. 197, 201, 40 A. 410 (1898), that court stated:

"The spoliation of papers and the destruction or withholding of evidence which a party ought to produce gives rise to a presumption unfavorable to him, as his conduct may properly be attributed to his supposed knowledge that the truth would operate against him. This principle has been applied in a great variety of cases, and it is now so well established that it is unnecessary to do more than state it."

More recently, our Superior Court in the case of *DeWeese v. Anchor Hocking,* 427 Pa. Super. 47, 50-51, 628 A.2d 421, 423 (1993) discussed the application of the doctrine of spoliation and the policy behind it in the context of a product liability case, as follows:

"This court has [always] held that where a plaintiff brings an action claiming that he suffered injury as

---

"I opened a box of diapers (Pampers—they glue them shut) for a customer. The truck had just come in and they weren't put out yet. She asked for my help. I pulled open the flap and pulled the tendons in my wrist." Excessive glue on the box was not mentioned. (N.T. deposition 8/6/97 at 109, 110.)

a result of a defective product, his failure to produce the product for inspection by the defense will render summary judgment against him [proper]. . . . We held that allowing a cause of action to continue without the allegedly defective product is contrary to public policy:

"To permit claims of defective products where a purchaser of the product has simply thrown it away after an accident, would both encourage false claims and make legitimate defense of valid claims more difficult. It would put a plaintiff (or plaintiff's attorney) in the position of deciding whether the availability of the item would help or hurt his or her case. Where producing the product for defense inspection would weaken rather than strengthen a case, we unfortunately are obliged to conclude that some plaintiffs and attorneys would be unable to resist the temptation to have the product disappear." (citations omitted)

Most recently our Supreme Court in the case of *Schroeder v. PennDOT,* 551 Pa. 243, 250-51, 710 A.2d 23, 27 (1998) reviewed the application of the spoliation doctrine and followed the lead of the Third Circuit in adopting a three-prong test for determining whether the doctrine requires the imposition of some sanction. The *Schroeder* court stated:

"In deciding the proper penalty for the spoliation of evidence the Third Circuit found relevant (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party, and (3) the availability of a lesser sanction that will protect the opposing party's rights and deter future similar conduct. . . .

"Having considered this authority, we adopt the Third Circuit's approach to the spoliation of evidence in *Schmid.* Fashioning a sanction for the spoliation of evi-

dence based upon fault, prejudice and other available sanctions will discourage intentional destruction. The plaintiff's burden of proof at trial to establish that a defective product caused his injury will protect defendants in cases where it is determined that summary judgment is not warranted based upon spoliation."

Although the Supreme Court in *Schroeder* and the Third Circuit in *Schmid, infra,* were dealing with products liability cases involving design defects, we can see no reason why the test adopted by those courts should not equally apply in a matter such as this involving a manufacturing defect.[3]

Applying *Schroeder* to the instant case there is no question but that plaintiff is entirely at fault in the destruction of the subject evidence. Notwithstanding plaintiff's assertion that she did not control the allegedly defective box, the box remained in the store for the entire day after the incident giving rise to this lawsuit. In fact, plaintiff inspected the box later in the day after the incident on at least one occasion. She knew that this box was defective, she knew that this defect had caused her injury, she knew that this box would be crushed and put in the trash at the end of the day if nothing was done to preserve it, and she did nothing. Plaintiff's suggestion that the box belonged to her employer and that her employer had control over it is silly. The only value that this cardboard box had was as evidence. And plaintiff did not even ask her employer if she could keep it.

---

3. A design defect by definition exists where there is a defect in the design of the product. With a design defect every product produced contains the same defect. On the other hand, a manufacturing defect occurs when the product is defectively made. Thus, every product with the same design does not automatically contain the same defect.

With regard to the prejudice suffered by defendant as a result of the destruction of the evidence, this case involves an alleged manufacturing defect. Clearly, the prejudice in this matter is greater than in *Schroeder* which dealt with a design defect. In *Schroeder,* as in all design defect cases, the expert witnesses could inspect any of the like products sold by defendant to examine the alleged defect. In this case, although the record contains evidence that sometimes boxes manufactured by defendant may contain excess glue, it is impossible for defendant to determine whether the subject box was one of these. It is also impossible for defendant to determine how much glue is too much glue as it relates to this box. Plaintiff's suggestion that there is no prejudice because defendant can simply look at another Pampers cardboard box misperceives the kind of defect here involved.[4]

Finally, we fail to see how some lesser sanction would effectively remedy the prejudice which plaintiff has created by her failure to preserve this evidence.

Plaintiff relies on the case of *Dansak v. Cameron Coca-Cola Bottling Company Inc.,* 703 A.2d 489 (Pa. Super. 1997) in support of her position. We agree with plaintiff that in many respects *Dansak* is similar to the instant case. In both, plaintiffs are employees of retail stores. In both, plaintiffs are stocking shelves with defendants' products. In *Dansak,* plaintiff suffered a severe laceration when she removed defendant's product from the container in which it was shipped. In the instant case, plaintiff was injured while opening a container in which defendant's product was shipped. However, the similarity stops there. In *Dansak,* plaintiff was not at fault at all in the destruction of the evidence.

---

4. See footnote 3, *supra.*

Her employer destroyed the evidence while she was at the hospital. In the instant case, the fault is entirely the plaintiff's. She could have preserved this evidence if she had wished. She did not.

It is of particular significance that the Superior Court in *Dansak* in reversing the granting of a motion for summary judgment, discussed the three-prong test adopted by the Third Circuit in *Schmid v. Milwaukee Electrical Tool Corporation,* 13 F.3d 76 (1994) and stated:

"*Schmid* plainly instructs that the plaintiff's degree of fault is indeed a *major component* of whether severe sanctions such as dismissal are appropriate in a given case." *Dansak,* 703 A.2d at 494. (emphasis added)

We are satisfied that our application of *Schmid* and *Schroeder* to the facts of this case was proper. We are also satisfied that the result reached by this court in applying *Schmid* and *Schroeder* was proper. The severe sanction of dismissal was appropriate under these circumstances.